### MOWINCKEL et al. v. NEW YORK & BERMUDEZ CO.

(Circuit Court of Appeals, Second Circuit. March 13, 1923.)

No. 185.

**Compromise and settlement ⊙⟶15(1)—Settlement contract held not to render charterer liable for hire until vessels were available.**

Owner of vessels breached the charter by order to the masters of the vessels to stay where they were when the United States declared war in the World War, and the parties later settled their differences by agreement providing there should be no deduction from the payment of hire under the charters "by reason of anything heretofore existing," and the

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

owner then cabled the vessel masters lifting the embargo he had placed upon the movements of the vessels, but the cable messages did not reach the masters for several days. *Held*, that the charterer was not liable for hire for the days between the date of the settlement and the date of the master's receipt of the cable orders.

Manton, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by Johan Ludwig Mowinckel and others against the New York & Bermudez Company. From a final decree for libelants, respondent appeals. Reversed and remanded.

In the spring of 1917, and at about the time the United States entered the World War, the New York & Bermudez Company (hereinafter called the Company) was the charterer of the steamers Heina and Mowinckel, of which libelant may be regarded (for the purposes of this case) as the owner. The employment under charter or charters of these steamers and others and by the Company had begun before the outbreak of war; they were Norwegian steamers and the charterer a New York corporation. The joint neutrality of both owner and charterer terminated with the declaration of war by the United States on April 6, 1917. Substantially at this time the steamship Heina was in the River Plate, and the Mowinckel at Progresso, Mexico, and they were both under charter party containing the usual clause that the shipmaster "shall prosecute his voyages with the utmost dispatch * * * (and) shall be under the orders and direction of the charterer as regards employment, agency or other arrangements."

Under orders actually given by the Company as charterer, these two vessels were duly required to leave the aforesaid ports and repair to the United States. The owner countermanded these orders and required the vessels to stay where they were or at least in neutral ports; he prevented obedience to the agreement of charter party because of his superior authority with the masters. Thereupon ensued quarrels and suits; also negotiations which terminated in a written agreement dated June 5, 1917.

Of this settlement it is enough to say that it was a real adjustment of conflicting claims generated by war conditions; but it did not terminate or wholly abrogate existing charters. The settlement was made in New York, and by it the ships were again to serve the charterer. This case depends upon the construction to be given to one section of the written agreement of June 5th, which is as follows (words deemed especially important italicized by us): "It is expressly agreed that there shall be *no deduction* from the payment of hire, or any claim to an extension of the period of said charters, *by reason of anything heretofore existing* and that the Company expressly waives any claim whatsoever against Mowinckel and the owner of any of said steamers and/or said steamers by reason of any delay, detention, or failure to prosecute the voyage with due diligence or otherwise with respect to the subject matter of this agreement *prior to the date of this agreement*, and expressly agrees that it will indemnify said Mowinckel and/or the said steamer and/or steamers and their owners from any claim by any sub-charterer or shipper on any of said steamers by reason thereof; and Mowinckel and the *owners* expressly waive and *release* the Company from *any claim* with respect to the subject matter of this agreement on account of any matter *prior to the date of this agreement.* The Company is to make no claims or *deductions* whatever *for stoppages during the negotiations concluded by this agreement.*"

Immediately this settlement agreement was executed and delivered, the owner cabled the masters of Heina and Mowinckel, substantially lifting the embargo he had placed upon the movements of these vessels. Owing to war conditions, which presumably were known to both parties, the cable messages did not reach the shipmasters for several days, during which, of course, the steamships lay idle in obedience to pre-existing owner's orders. When settlement was made under the charter party, the Company withheld hire for days

between June 5th and masters' receipt of cable orders. Libelant brought suit for the amount so withheld, the District Court gave decree for the same, and this appeal followed.

Roscoe H. Hupper, of New York City, for appellant.
Bullowa & Bullowa, of New York City (Emilie M. Bullowa, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). No ambiguity or muddiness in expression can, in our judgment, be found in the written settlement contract. It declares on its face the nature of the pre-existing disputes and differences between owner and charterer, and compromises those matters in plain language. To us, and we think to any plain man, that language means that from the instant of delivery of contract of compromise the ships were to resume work for the charterer under the old charters as modified. The terms of work were somewhat changed, much to the advantage of owner, but the pre-existing obligation to work was recognized. The compromise contract provided no period of delay, and in its terms took no account of difficulties in cable or other communication—a matter as well known to one party as to the other. From consideration of this agreement we see no reason why any unanticipated hardship or deprivation should not lie where it fell.

But if one inquires why the ships did not go to work again at once, this conclusion is undisturbed, for another question is crucial: Why did the ships ever stop working? Why did they lie idle in neutral ports? Plainly because of owner's orders, charterers vigorously protesting against what they declared to be gross breaches of charter contract. The object of compromise, the charterer's motive for concessions made, was to obtain withdrawal of owner's stop orders, and in effect owner agreed on ample consideration, to withdraw the same. Nobody but owner could withdraw them, and he agreed so to do because he was released (inter alia) from the consequences of failure to "prosecute the voyage with due diligence * * *. *prior* to the date of this agreement." If it was ever intended to release owner from the consequences of such failure *after* date of agreement, it should have been stated; the expression of one proposition furnishes strong argument for exclusion of all other and inconsistent ones.

Again, since no one but owner could undo what owner had done, the duty of giving orders was on owner, and it appears in evidence that owner assumed such duty, and prepared cables even before compromise signed. As a general principle, if one assumes a duty, he assumes also the risk of failure, even undeserved and accidental failure in performance of same. We have no doubt the risk of cable delay was on owner.

Finally if the compromise agreement be regarded as a new, and superseding contract, plainly the ships were not entitled to charter hire, until they reported for duty; and this they did not do until they actually received owner's orders.

We noted in argument some objections to the rate at which the Company withheld the hire sued for. The basis for proper computation is not before us; our holding is only that the Company was entitled to withhold from owner what it would have paid owner had· the ships reported for duty on June 5th. Whether by reason of the premises the Company suffered any additional recoverable damages we do not know, and discover no such issue in the pleadings.

Decree reversed, with costs, and cause remanded, for entry of new decree not inconsistent with this opinion.

MANTON, Circuit Judge (dissenting). The controversy as to who was right or wrong in giving the conflicting orders to the master of the steamer "Heina" while she was in River Plate, and the steamer "Mowinckel" at Progresso, Mexico, ought not to enter into our considerations now, for the parties made concessions and compromised their differences on June 5, 1917, and reduced their agreement to writing. The writing itself permitted neither party to keep anything in reserve for future action. It is evident that the parties intended to settle all matters concerning which they differed and start anew with the charter agreement. It provided for releases from "any claim with respect to the subject-matter of this agreement on account of any matter prior to the date of this agreement. The Company is to make no claims or deductions whatever for stoppage during the negotiations concluded by this agreement."

Any reasonable interpretation of the intention of the parties as gained from this agreement, would require sufficient time to give notice to the ship to proceed or for the owners to recall their stoppage orders. The parties could not have intended anything else. The owners were released from all the consequences of the stoppage order. Now to hold that the owners may not collect hire during the period between June 5th, when the agreement was signed, and when the orders were actually received by the masters of the vessels to proceed, would seem to impose an obligation on the owners which was never contemplated by the parties on June 5th.

For this reason, I dissent.